UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

RODNEY J. PICKENS                          CIVIL ACTION NO. 07-CV-2240

VS.                                        JUDGE MELANÇON

MICHAEL J. ASTRUE
COMMISSIONER                               MAGISTRATE JUDGE METHVIN
SOCIAL SECURITY ADMINISTRATION

<u>REPORT AND RECOMMENDATION</u>

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED.**

*Background and Procedural History*

Appellant Rodney J. Pickens is currently 49 years old and has a high school education.

Pickens has performed heavy unskilled work in the past, including working as a hydro-

blaster and in a warehouse.  On his last job, Pickens was working as a laborer on Conoco docks

for an environmental clean-up company.  The job was to clean up a toxic spill into the Calcasieu

River. Pickens was exposed to Ethylene Dichloride (EDC) on this job which resulted in his

disability.[1]

Pickens seeks disability insurance benefits, alleging disability since November 2, 1997

due to headaches, dizziness, shortness of breath, nausea, nervousness, rashes, exhaustion,

adjustment disorder, and weak muscles.

---

[1] Mr. Pickens testified that he was injured and left work in 1997.  However, he did not state the precise dates of his
exposure to the EDC or the date he terminated his employment with Conoco, nor or the dates otherwise set forth in
the record.

Pickens filed his application on August 15, 2002 which was denied on initial review, and following an administrative hearing, the ALJ denied benefits on April 15, 2004.[2] The Appeals Council denied review and Pickens appealed.

The case was assigned to District Judge James Trimble and referred to United States Magistrate Judge Alonzo P. Wilson for report and recommendation. Pursuant to the fourth sentence of 42 U.S.C. § 405(g) the matter was reversed and remanded to the Commissioner for further proceedings on June 15, 2006. (Rodney Pickens v. U.S. Commissioner Social Security Administration, Civil Action No. 04-2152, Rec. Doc. 33).[3]

An administrative hearing was conducted on March 28, 2007. On April 25, 2007, the ALJ denied Pickens' application. The Appeals Council denied review and Pickens again appealed to this court.

Because Pickens remained insured through December 31, 2002. Pickens must therefore show that he became disabled on or before December 31, 2002 in order to be entitled to disability insurance benefits.

---

[2] Pickens states that he filed a prior application for disability insurance benefits on April 30, 2001 with a protective filing date of April 18, 2001. The application was denied on December 28, 2001. He requests that this matter be re-opened because the current application was filed within 12 months of the date of the notice of the initial determination under 20 C.F.R. § 404.988. Pickens does not show that any request for re-opening the matter was presented to the Commissioner and, thus, the issue is not properly before this court.

[3] Pickens asserts that the unopposed motion to reverse and remand transcript pages 266-268 should be stricken since this motion was not filed in Civil Action 04-2152. Pickens has not shown how the inclusion of this motion in the record will prejudice him. Further, the undersigned takes judicial notice that Pickens opposed the government's motion to remand (Civil Acton 04-2152 - Rec. Doc.). Accordingly, the request to strike is denied.

### *Assignment of Errors*

Pickens alleges the following errors: 1) the ALJ failed to sustain his burden at Step Five

of the Evaluation Process; and 2) the ALJ erred in failing to make a separate finding that Pickens

can maintain employment for a significant period of time.

### *Standard of Review and Procedure for Analysis of Impairments*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the

Commissioner's decision is supported by substantial evidence in the record; and (2) whether the

decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994).[4]   In determining whether a claimant is capable of performing substantial

gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R.

§404.1520(b)-(f) (1992).[5]

---

[4]  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision.  Johnson, 864 F.2d at 343.

[5] The procedure is as follows:

1.    If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2.    A person who does not have a "severe impairment" will not be found to be disabled.

3.    A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.    If a person can still perform his past work, he is not disabled.

5.    If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, such as adjustment and depressive disorders, and anxiety symptoms here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[6]

In the instant case, the ALJ determined that Pickens' hypertension, asthma, and adjustment disorders are severe impairments.[7] Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which Pickens can perform, and therefore he is not disabled.[8]

### *Medical Evidence*

## Administrative Hearings

## December 9, 2003

Pickens testified that he quit work in 1997 following his exposure to the toxic chemical because it caused him to suffer from migraine headaches, severe respiratory problems,

---

[6] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004).

[7] Tr. 242.

[8] Tr. 248.

hypertension and dizziness, swelling and pain in his hip area.[9]  He also complains that the

exposure has caused him emotional impairments, including irritability, inability to sleep,

excessive weight gain, difficulty in making decisions, difficulty with concentration, crying spells,

absence of energy, feeling of guilt, anxiety, and problems with getting along with his family.[10]

Pickens' spouse, Amanda, was married to him before the clean-up accident.  Ms. Pickens

and confirmed Pickens' testimony.[11]

**March 28, 2007**

Pickens testified he was seeing a Doctor Kane for his headaches, sinus, self-pain, and

body pains."[12]  He testified consistently with his prior testimony regarding his limitations.

Pickens did not know how long he could stand and sit.[13]  He did not remember when he first was

evaluated for his mental condition, was not taking any medication, and had not been hospitalized.

Most of the day he sits around the house and  watches television.  In the last 5 years, the Pickens

have not had any family vacations and left Louisiana only once for a 3 hour visit in Texas.

---

[9] Tr. 203-207.

[10] Tr. 209-209.

[11] Tr. 211-214.  She testified that he has trouble breathing, sleeping, headaches, high blood pressure, spends a lot of time by himself in the bedroom, and sits a lot while he gets dressed.  According to Ms. Pickens, her husband used to be very witty but is now defensive.

[12] Tr. 293.

[13] Tr. 294.

*Mental Disability*

**Dr. R. Joseph Tamimie, M.D.FACOEM, Medical Director, East Jefferson General Hospital, Occupational Clinic**[14]  - Dr. Tamimie examined Pickens on May 13, 1998.  Pickens complained that the EDC made him sick on the job, and he was treated by medics.

Dr. Tamimie's mental status evaluation was that Pickens' appearance and behavior was normal with appropriate mood and affect. His conversation was clear and coherent; his attention and concentration was within the normal limits with "Serial Three" testing but had "more apparent deliberate difficulty with "Serial Seven Testing."[15]  Pickens could recall 3 out of 4 items with short term memory testing; his long-term memory and abstract reasoning were intact; and he demonstrated average intelligence.

**Jerry L. Whiteman, Ph.D.** - On December 19, 2003, Dr. Whiteman, a licensed psychologist, examined Pickens, administering the Minnesota Multiphasic Personality Inventory (MMPI), conducting a mental status interview and making  behavioral observations.[16]

Pickens informed Dr. Whiteman his exposures to the chemical and his resultant inability to work.  Dr. Whiteman concluded that Pickens' cognitive abilities appeared to be low average or borderline.  Whiteman observed that Pickens was anxious and overwhelmed by his current situation.  Pickens explained that he relied on others to assist him with daily tasks of living.  Dr. Whiteman found that Pickens' capacity to maintain effort and tolerate stress was marginal.  Dr. Whiteman recommended medication management and individual therapy.

---

[14] Tr. 140-144.

[15] Tr. 142-143.

[16] Tr. 184-186.

Dr. Whiteman again examined Pickens on May 20, 2004.[17] Dr. Whiteman found that Pickens' cognitive abilities were within normal limits but that he was suffering from depression which might be related to his environmental accident. Dr. Whiteman again concluded that Pickens was depressed, fatigued, and heavily dependent upon others to assist him with daily living and recommended treatment.

Dr. Whiteman examined Pickens a last time on March 15, 2007.[18] Pickens reported daily headaches and that was taking medications for high blood pressure, high cholesterol, stomach problems and asthma. Pickens reported that his primary problem was his nerves due to his respiratory problems. Dr. Whiteman observed that Pickens' mental status was adequate in all spheres but he had alternations of reality and trouble with sleeping. Pickens' pace and persistence were labored; his long term memory was below overage. Dr. Whiteman concluded Pickens was mildly mentally retarded. Dr. Whiteman opined that Pickens' cognitive abilities had been impaired since Pickens' accident.

**Dr. Charles M. Robertson, Psy.D.** - Dr. Robertson, a licensed psychologist, completed an examination/assessment of Pickens on July 19, 2007.[19] Dr. Robertson concluded that Pickens' history and presentation were consistent with long-standing major depression with anxiety and pain disorder and that he functioned in the mild range of mental retardation.

---

[17] Tr. 189-191.

[18] Tr. 332.

[19] Tr. 231.

***Physical Disability***

**St. Patrick Hospital** - Pickens was treated at St. Patrick's emergency room on April 18, 1997 and August 26, 1997 for respiratory problems, including trouble breathing and coughing.[20]  His chest x-rays were normal on both occasions.[21]

**Dr. R. Joseph Tamimie, M.D.FACOEM** - As stated before, Dr. Tamimie examined Pickens in 1998.  Pickens complained of asthma, high blood pressure, headaches, and a recurrent rash around his groin and under his arms.  Pickens had been treated by medics when he was exposed to the toxins; but, since that time, aside from an inhaler and high blood pressure medication, and occasional Zantac for abdominal pain, Pickens had not received any other medical treatment.

Dr. Tamimie opined that Pickens had no medical problems related to his exposure to EDC but did have allergies.  All end-organ systems which would be expected to have residual chronic toxicity associated with EDC exposure were found to be normal.  Dr. Tamimie believed that Pickens' neurologic tests revealed exaggerated and inconsistent responses.  He concluded there were no objective findings that correlated with Pickens' subjective complaints of loss of vision, hearing difficulty, loss of smell and frequent diarrhea.

**Dr. Arnand Roy, M.D.** - Dr. Roy examined Pickens on or about September 27, 2001.[22]   Dr. Roy noted that Pickens was on Prinivil, a blood pressure medication, for headaches.[23]  Dr. Roy's impression was that Pickens had dyspnea and angina possibility related to his exposure to the

---

[20] Tr. 126-139.

[21] Tr. 132, 137.

[22] Tr. 145-146.

[23] Physician's Desk Reference at 2087 (Physicians' Desk Reference, Inc., 63rd ed. 2009).

EDC; had moderate to severe hypertension which needed to be aggressively controlled; and had not seen a doctor for over a year which could possibly the reason that he was having angina, blurry vision and headache which would probably be relieved once his blood pressure was controlled. Dr. Roy ordered a pulmonary function test which showed that Pickens had a mild lung restriction.[24]

**Dr. Percival Kane, M.D.** - Dr. Kane saw Pickens for various ailments from August 28, 1997 through August 27, 2002, including high blood pressure, elevated triglycerides, somewhat elevated "sugar,", hearburn, and flu.[25] Dr. Kane notes that Pickens had received a settlement in connection with his exposure to EDC in 1997 and had not returned to work since.[26]

**Dr. N. Jooma, M.D., Quality Care Medical Group** - Dr. Jooma performed a consultative examination on November 21, 2002.[27] Pickens complained of shortness of breath, diarrhea, puffy eyes, generalized weakness and headache since his exposure to EDC. His shortness of breath was triggered by chemicals like Lysol and gasoline in a gas station and was relieved by Albuterol inhalers. Pickens also complained of decreased concentration. His medications were Prevacid, Lotrel and HCTZ, ( for high blood pressure), gemfibrozil, (for high cholosterol), Vanceril and Ventalin (for asthma), and Allegra.[28]

---

[24] Tr. 148.

[25] Tr. 158-164.

[26] Tr. 160.

[27] Tr. 166-172.

[28] Lotrel is

Pickens' blood pressure was 160/100, weight 234 lbs., and height 70". His eyes were swollen, lungs were clear, breath sounds were normal with no wheezing, rhonchi (abnormal breath sounds), or crackles noted. His heart rate was regular in rate and rhythm, no rub, gallop or murmur. Pickens was noted to be obese, had a normal gait, could stand on heels and toes and raise from a squat with some difficulty but complained of right hip pain.

Dr. Jooma's impression was that his EKG showed a normal significant for left atrial enlargement, with no ST changes. Pickens' history, vital signs, and EKG suggested uncontrolled hypertension which could possibly explain his headache. His atypical chest could be explained by his history of gastroesophageal reflux disease. Pickens' exam was abnormal for swollen, eyes, positive straight leg sign and decreased motor strength, decreased range of motion particularly in his hip and knee.

### Findings and Conclusions

The issue before the court is whether Pickens was disabled before December 31, 2002.

### *The ALJ's Findings[i]*

The ALJ concluded that:

> . . . in an 8 hour workday the claimant has the residual functional capacity to lift/carry 10 pounds frequently and 20 pound occasionally, with a sit/stand option, and ability to walk 4 of 8 hours. The claimant has unlimited ability to perform gross and fine manipulations. He should have limited exposure to dust, fumes, gases, and chemicals. The claimant is limited from working at heights and uneven surfaces, and using heavy machinery. He retains the capacity to understand simple instructions, and perform and concentrate on simple tasks, and adapt to workplace changes and supervision.[29]

---

[29] Tr. 20.

Pickens claims that the ALJ erred because he did not make a separate determination that he could maintain employment. Absent evidence that a claimant cannot maintain employment or evidence that the ALJ did not appreciate that a claimant's ability to perform work on a regular basis must be considered in his RFC analysis, the ALJ need not make an express finding regarding a claimant's ability to sustain employment. See Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

Pickens' argument is conclusory and he has not cited any evidence to support his argument. However, having thoroughly reviewed the record, the undersigned concludes that the ALJ's implicit finding that Pickens' mental impairments do not preclude him from maintaining employment is not supported by substantial evidence. The ALJ determined:

> The consideration of the claimant's mental impairment also fails to provide a basis for his allegations. The claimant did not seek treatment for a mental impairment prior to expiration of his date last insured. In the 1998 examination by Dr. Tamimie, the claimant's mental status evaluation revealed normal and appropriate mood and affect. (Exhibit 2F/3). The claimant had clear and coherent conversation and he was fully oriented. His attention and concentration were within normal limits with serial three testing. He had more apparent, but deliberate difficulty with serial seven testing.

> Later psychological testing was conducted after the expiration of the date last insured, thus this evidence cannot be considered in the evaluation of disability prior to December 31, 2002. Nevertheless a review of these evaluations do not support the claimant's allegations to the extent that he was unable to function during the relevant time period. For example, in 2007 testing indicated mild mental retardation based on results from the Wechsler Adult Intelligence Scale 3rd Ed. (WAIS-III). (Exhibit 11F/1-3). However, the IQ scores are inconsistent with the claimant's behavior and interactions. They are also inconsistent with his successful ability to perform his prior work and daily activities. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998*); Muse v. Sullivan,* 925 F.2d 785, 790 (5th Cir. 1991). Similarly, the claimant's report of hearing auditory hallucinations is absent in all record prior to December 31, 2002, and other evidence after that date. In fact, it appears that the claimant never complained of mental problems until after his date last insured expired. And, as noted above, the claimant was seen to be malingering during the physical testing.

In any event, during the hearing the claimant appropriately answered questions posed and provided detailed historical information. He never sought treatment from a psychologist or psychiatrist, and he was never hospitalized for a mental impairment. There is no evidence of abnormal thought content or processing or any bizarre behaviors. And, the claimant takes no medication for the treatment of a mental impairment.

In reaching an opinions as to residual functional capacity, the undersigned reviewed all medical opinions of record. The only opinions related to the period under consideration are from state agency medical consultants. (Exhibits 4F; 8F). Minimal weight is assigned to these opinions as the consultants did not have access to the record in its entirety, including testimony from the claimant or his witness.

* * *

Two other physicians rendered opinions as the claimant's mental ability to work. (Exhibits 10F). However, these opinions were offered well after the expiration of the claimant's last insured. Therefore, this evidence is not applicable to this evaluation. In any event, during the latter evaluation, the claimant made subjective allegations regarding auditory hallucinations, which are uncorroborated in any other record evidence. Similarly, IQ testing indicating mild mental retardation is unsupported by the record in its entirety. The evaluators [ ] opinion the retardation has existed since the "work accident" cannot be supported by any treatment notes or other objective medical evidence in the record since the evaluator saw the claimant only once in 2007. Inconsistencies exist in the evaluators assessments. The 2007 assessment opined the claimant's "cognitive abilities have been impaired since his work related accident: (Exhibit 11F, p.3) yet the same evaluator assessed the claimant on May 20, 2004, and opined his "cognitive abilities appear to be within normal limits" (Exhibit AC-1).

To the extent that the claimant's impairments are supported by the record, the residual functional capacity set out above accommodates the claimant's resulting symptoms and limitations.[30]

The undersigned concludes that the ALJ's decision to rely Dr. Tamimie's 1998 evaluation

and reject the two psychologists' opinions because they were rendered after Pickens had become

---

[30] Tr. 246-247.

uninsured and because the opinions conflict with the evidence of record is conclusory and unsupported by substantial evidence of record.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity.  Perez v. Heckler,  777 F.2d 298, 302 (5th Cir. 1985).

Regardless of the source, the ALJ should evaluate every medical opinion.

Unless the ALJ gives a treating physician's opinion controlling weight, when the ALJ decides the weight to give a medical opinion, he should consider the examining relationship, the treatment relationship, supportability, consistency with the record, and specialization.  *See* 20 C.F.R. § 404.1527(d).

The ALJ will generally give more weight to specialist about medical issues related to his or her area of specialty than to a non-specialist.  20 C.F.R. § 404.1527(d)(5).

Generally, the ALJ will give more weight to treating physicians *since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's impairments* that individual examinations or objective medical findings may not. 20 C.F.R. § 404.1527(d) (emphasis added).

"The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Moore v. Sullivan, 919 F.2d 901, 905 (5th cir. 1990).  However,  ". . . the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position.  Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000).

**Relevancy and Credibility**

The ALJ relies solely on Dr. Tamimie's opinions. Drs. Wideman and Robertson specialize in psychology while Dr. Tamimie does not.[31] The record does not contain records from any treating physician that observed Pickens over time. The record shows that Dr. Wideman examined Pickens several times over several years. Thus, although Dr. Wideman did not treat Pickens, he is able to provide a specialized, longitudinal picture of Pickens' impairments that is not otherwise provided by a treating physician.

Dr. Wideman concluded in his 2004 opinion, after his assessment and review of his previous records, that Pickens:

> suffers from depression which may be attributed to a work related respiratory accident/exposure. Consequently, he is now depressed, fatigued, and heavily dependent upon others to assist him with the requirements of daily living. Medication management and supportive individual therapy are needed in order to ensure his stability.

Dr. Wideman further concluded in a 2007 assessment the Pickens has been mildly mentally retarded throughout his life and his depression and anxiety were likely to have resulted from his exposure to the toxic chemicals. The undersigned finds that the ALJ's decision to dismiss this opinion is unsubstantiated by the record.

Pickens testified, and his wife confirmed, that, since his exposure to EDC in 1997, he had trouble sleeping, no longer participated in sports but stayed at home watching television, does not take vacations, rarely drives, has difficulty making decisions, concentrating, and is irritable.

---

[31] Dr. Tamimie is a Fellow of the American College of Occupational and Environmental Medicine.

Pickens also testified that he had severe problems reading and writing.[32]  Pickens was

only able to get through high school and graduate because he was an athlete and "did nothing."[33]

He found out that, when he went to Southern University on a track scholarship, he could not

understand the professors and just quit, walked out.[34]

Although Dr. Wideman found in his May 2004 examination that Pickens' cognitive

abilities appeared to be normal, he had not yet taken an IQ test but only the MMPI.[35]  Dr.

Wideman's opinions and Pickens' testimony are supported by Dr. Robertson's opinions.  Only

after examining Pickens and reviewing his IQ test results did reach the same conclusion that

Pickens had major long-standing depression and intellectual problems that caused Pickens to

severe problems interacting with others and carrying detailed instructions.[36]

Further, based in part on Dr. Tamimie's report that Pickens appeared to be malingering,

the ALJ concluded that Pickens' testimony was only partially credible.  To the contrary, Drs.

Wideman and  Robertson each concluded Pickens was not exaggerating his symptoms.

The undersigned further finds that the ALJ's rejection of Pickens' complaints of disability

because Pickens had not sought treatment frequently is unsupported by substantial evidence.

Pickens acknowledged that he should have gotten psychological help immediately following his

---

[32] Tr. 303.

[33] Tr. 304.

[34] Tr. 304.

[35] Tr. 186.

[36] Tr. 230.

exposure. In fact, Dr. Wideman found that an individual such as Pickens would "have learned to tolerate a great deal of discomfort."[37]

The ALJ also ignored Dr. Wideman's vocationally relevant opinion that Pickens' ability to attend and concentrate was likely to be seriously impaired.[38] In connection with his examinations of Pickens, Dr. Wideman provided three separate Medical Source Statements regarding Pickens' Mental Ability to Do Work-Related Activities. In the MSS dated May 21, 2004, Dr. Wideman opined that Pickens was moderately limited in his ability to understand, remember, and carry out short, simple instructions.[39] He found that Pickens was markedly limited in his ability to make judgments on simple work-related decisions and in his ability to understand, remember, and carry out detailed instructions.[40] Dr. Wideman also concluded that Pickens was moderately limited in his ability to interact appropriately with the public, supervisors and co-workers.[41] Dr. Wideman assessed that Pickens has marked limitations in his ability to respond to work pressures and to changes in a routine work setting.

Considering the foregoing, the undersigned finds that the ALJ decision to rely *only* on evidence that supports his decision is not supported by substantial evidence. The ALJ has

---

[37] Tr. 185.

[38] Id.

[39] Dr. Wideman's opinions vary slightly in the other two MSS statements. In the 2003, report, Dr. Wideman concluded that Pickens was markedly (rather than moderately) limited in the his ability to interact with the public, his supervisors and co-workers. His other results were the same. In his 2007 report, Dr. Wideman's examination showed that Pickens was moderately limited in his ability to interact with the public, supervisors, and co-workers and moderately limited in his ability to make judgments on simple work-related judgments. His other findings correlated with his 2004 findings. (Tr. 334-335). The undersigned finds these differences are non-dispositive to a decision and that Dr. Wideman's 2004 opinions are supported by the medical evidence of record as discussed above.

[40] Tr. 187, 192, 335.

[41] Tr. 188, 193, 336.

ignored opinions based on objective evidence and examinations over time performed by two separate specialists in psychology. The record shows that Pickens has severe impairments which limit his ability to make judgments on simple work-related decisions, ability to respond appropriately to changes in a routine work setting and to respond appropriately to work pressures in a usual work setting. The undersigned further finds these limitations have been present since at least November 2, 1997 after his exposure to EDC. The undersigned thus concludes that the ALJ's decision that Pickens is not limited in these areas is unsupported by substantial and evidence as well as his residual functional capacity assessment.

The vocational expert testified that an individual of Pickens's age and vocational background and physical residual functional capacity to do a limited range of light work but who is additionally limited in his ability to make judgments on simple work-related decisions, ability to respond appropriately to changes in a routine work setting and to respond appropriately to work pressures in a usual work setting would not be able to maintain employment.[42]

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

---

[42] Tr. 342.

Considering that Pickens cannot maintain employment, and the fact that the vocational expert testified that an individual of the age and residual physical functional capacity such as Pickens who is also limited in his ability to make judgments on simple work-related decisions, ability to respond appropriately to changes in a routine work setting and work pressures in a usual work setting would not be able to maintain employment, the undersigned finds that the ALJ's determination that Pickens could perform work on a sustained basis as of December 31, 2002 is not supported by substantial evidence.[43]

### *Conclusion*

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that Rodney Pickens be awarded benefits consistent with an onset date of December 31, 2002.

**IT IS FURTHER ORDERED** that Pickens' request to strike transcript pages 266-268 from the record is **DENIED**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may

---

[43]    Pickens also argues that the record does not contain the VE's qualifications; however, Pickens did not object at the time of the hearing. Moreover, Pickens relies on the VE's testimony to conclude that there are no jobs that he can perform in the economy. The undersigned thus finds this argument to lack merit.

        Pickens also argues that the VE's testimony conflicted wit the *DOT*. Pickens does not specify how the VE's testimony supposedly conflicts, and, again, relies on the VE's testimony to argue there are not jobs for him. Therefore, the undersigned finds this argument to be meritless.

respond to another party's objections within ten (10) days after receipt of a copy of any

objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on August 21, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)